LaramoRE, Judge,
dissenting:
I respectfully dissent for the reasons stated in the majority opinion in Hercules Powder Company v. United States, supra.
*630 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. The petition in this proceeding was filed pursuant to the provisions of section 1491, title 28 of the United States Code, for the recovery of income taxes for the calendar years 1949 to 1953, inclusive.
2. Plaintiff is a New York corporation. Its principal place of business is at One River Road, Schenectady, New York. At all times material here, plaintiff was engaged primarily in the business of manufacturing and selling a wide range of electrical appliances and equipment and related products. Plaintiff’s books of account were maintained and its tax returns filed on the accrual basis for a taxable year ending on December 31.
3. Plaintiff’s income tax returns for the calendar years 1949 to 1953, inclusive, were filed with the District Director, Albany, New York (formerly the Collector of Internal Revenue for the Fourteenth New York District), hereinafter referred to as the “District Director.” Said returns disclosed income tax liabilities (including excess profits taxes), all of which were paid in quarterly installments, as follows:

Year Tato Liability

1949-$67,816, 951.88
1950- 152,230,102. 91
1951- 238, 369, 882.14
1952- 248,761,262.57
1953- 303, 812,165. 89
4.Thereafter, on audit of said returns by the Commissioner of Internal Revenue (hereinafter referred to as the “Commissioner”), it was determined that additional income taxes (including excess profits taxes) were due from, or that credits were allowable to, plaintiff. Additional taxes were paid by plaintiff to the District Director and credits were allowed in the following amounts:

*631
Amount of Payment T^ear (or Credit)

1949-$3,094, 843.20
1950- (1,042,100.14)
2,227, 695.68
1951- 373, 312.07
61,414.65
1952- (3,484,329.24)
1,162, 572. 64
1953- (2,169,896.30)
3,396, 819.76
In addition to the foregoing additional taxes paid, plaintiff paid substantial amounts of deficiency interest thereon. Timely claims for refund were filed and were denied.
5. As of January 1, 1936, plaintiff’s capital structure consisted of 29,600,000 shares of authorized voting common stock of no par value of which 28,845,927 36/100 shares were issued and outstanding. In addition, plaintiff had authorized, but not issued, 1,207,036 shares of $10 par value 6 percent cumulative special stock. No changes in plaintiff’s authorized or issued stock occurred from January 1, 1936, through December 31, 1953, except that on April 20, .1948, plaintiff’s stockholders approved an increase in the number of authorized shares of common stock to 35,000,000 shares. At all times material here, plaintiff’s common stock was listed and traded on the New York Stock Exchange.
6. From January 1923 until its complete liquidation in 1948, G. E. Employees Securities Corporation (referred to hereafter as “Employees Securities”) was a Delaware corporation. All of its outstanding common stock was owned by plaintiff. It was organized and operated for the purpose of providing a medium for investment of savings of plaintiff’s employees and of the employees of certain of plaintiff’s affiliated corporations. Plaintiff paid in all its equity capital. From 1923 to 1941, Employees Securities issued debenture bonds, having varying terms, to participating employees of plaintiff and certain of its affiliated corporations. The bonds originally issued carried a 6 percent interest rate with a guarantee by plaintiff that as long as the purchasing employees remained in plaintiff’s employ, they would re *632 ceive an additional 2 percent per annum. In 1931, approximately 33,000 employees held bonds of Employees Securities. In 1933, a 5 percent bond was offered to the employees with an additional payment of either 1 percent or 2 percent, depending upon plaintiff’s earnings. Later a 4 percent bond was offered and was substituted for the 6 percent and 5 percent bonds. The bonds were redeemable on demand by the employees. No bonds were issued to anyone other than employees of plaintiff and its affiliated corporations. No bonds were issued after 1941. In that year, plaintiff commenced selling U.S. Government bonds to its employees and did not want to compete with the program of the U.S. Treasury Department. The management of Employees Securities at all times was vested in a board of directors consisting of fifteen members. Of these, eight represented the plaintiff as the sole stockholder and seven represented the bondholders.
7. When Employees Securities was formed in 1923, it was contemplated that at least 25 percent of its assets would be invested in plaintiff’s common stock. Plaintiff wished to give the employees who purchased bonds an investment that would not be subject to market fluctuations, as well as an indirect interest in the company for which they worked. In 1931, Employees Securities owned slightly over 500,000 shares of plaintiff’s common stock. Originally, the remainder of its capital was invested in securities of electric public utilities. In 1933, and as a consequence of the depression, Employees Securities shifted a portion of its investments to industrial securities. The investment policy of Employees Securities was to obtain security of principal and regularity of income rather than appreciation in principal.
Decisions to make or change investments were made by the officers of Employees Securities. Such decisions were not dictated by the management of the plaintiff, and the record contains no evidence that plaintiff’s management made any effort to influence them directly or indirectly. Nor does the record contain any evidence to show whether, or the extent if any, to which such decisions might have reflected policies or views of plaintiff’s management as a result of general *633 knowledge of suck policies or views on the part of Employees Securities’ officers or directors. Employees Securities did not hesitate to take advantage of changing conditions, from time to time, by realizing gains on securities through open market sales. Such gains were not taken into current income on the books of Employees Securities but rather were credited to a reserve against which any losses could be charged. Sizable losses were charged against that reserve during the depression years of the early 1930’s.
8. Employees Securities never defaulted on the principal of or interest on any of its outstanding bonds. However, in about April of 1932, its capital became impaired. Plaintiff, though it had no contractual obligation to do so, corrected this impairment by putting $7,500,000 into Employees Securities in exchange for preferred stock. In June of 1932, plaintiff contributed securities of the value of $28,899,000 to the capital of Employees Securities. This latter contribution was returned to plaintiff in the form of special dividends paid out of capital surplus in 1935 and 1936, when the market value of Employees Securities’ other assets had increased sufficiently to provide adequate protection for the bonds. Again in 1939, plaintiff contributed to the capital of Employees Securities, securities of its affiliated corporations of the value of $15,000,000, and also surrendered for cancellation the preferred stock it held. These steps were taken to afford additional protection for the outstanding bonds.
9. The investment position of Employees Securities in plaintiff’s common stock remained substantially constant over the years and increased materially in value. As of January 1,1936, Employees Securities held in its investment portfolio 532,000 shares of plaintiff’s common stock. In 1938, it sold 8,600 shares and purchased 5,600 shares of plaintiff’s common stock on the open market. No other purchases or sales of plaintiff’s stock were made between January 1, 1936, and the complete liquidation of Employees Securities in 1948. The sale of 8,600 shares in 1938 was made to realize gains for income tax purposes which could be offset against deductions for interest paid on the bonds. *634 The repurchase of 5,600 shares in the same year was to restore Employees Securities’ position in plaintiff’s stock.
10. Beginning in 1942, Employees Securities filed Federal income tax returns as a regulated investment company (§§ 361, 362, 1939 I.E.C., as amended). The practical effect of filing such returns was that if a qualified corporation distributed all of its income, it had no tax liability. This was accomplished by the payment to plaintiff of dividends on Employees Securities’ common stock. As sole stockholder, plaintiff, by agreement with the bondholders, was entitled to the same rate of return on its investment as the bondholders received on theirs. During most of the years of its existence, Employees Securities paid dividends to plaintiff in cash. In 1945, 1947, and 1948, however, Employees Securities distributed to plaintiff, as dividends on its common stock, shares of plaintiff’s common stock aggregating 53,200 shares. These dividends in kind were made because the directors of Employees Securities knew that plaintiff could use such shares for its own corporate purposes. After payment of these dividends in kind, Employees Securities held 475,800 shares of plaintiff’s common stock.
11. In addition to its outstanding bonds, Employees Securities issued notes to the General Electric Additional Pension Trust, a trust to which employees contributed to supplement their pensions. Also, other employee plans to which plaintiff’s employees had contributed used Employees Securities as a medium of investment of their funds.
12. By 1948, conditions had changed so that Employees Securities could no longer function as a medium of investment for employee savings. New bonds could not be issued to employees on a basis that would pay an attractive rate of return. As of June 1, 1948, plaintiff and Employees Securities adopted a plan for the complete liquidation of Employees Securities. The plan of liquidation provided for the calling for redemption of Employees Securities’ outstanding debenture bonds (held by the participating employees) and notes (held by the General Electric Additional Pension Trust and other employee plans) in the amounts of $30,534,380 and $29,283,000, respectively. As of that date, *635 Employees Securities held in its investment portfolio 475,800 shares of the common stock of plaintiff which were carried on its books at a cost value of $6,636,557.5o.[1] Its total investment portfolio at that date aggregated $107,217,612.51 at cost. The presence of 475,800 shares of plaintiff’s stock in Employees Securities’ portfolio did not affect the decision to liquidate that corporation. Pursuant to the plan of liquidation, and after provision for complete redemption of the outstanding debenture bonds and notes of Employees Securities, these 475,800 shares of plaintiff’s stock, together with other assets held by Employees Securities, were assigned to plaintiff on September 23, 1948. At the time of the liquidation, Employees Securities had funds in excess of amounts due its creditors and plaintiff. A 15 percent bonus was therefore paid to the bondholders and, pursuant to agreement between the bondholders and plaintiff, the balance of the excess funds was paid over to the G. E. Pensioners Hospitalization Trust, a trust for pensioners of plaintiff.
13. Among the other assets assigned to plaintiff by Employees Securities, upon its liquidation, was a portfolio of securities, largely common stocks, of corporations not affiliated with plaintiff. Upon their receipt, plaintiff charged these securities on its books to an account known as Miscellaneous Securities. Thereafter, they were liquidated by plaintiff through open market sales as quickly as was practicable. This was done because of a general policy of plaintiff not to invest its surplus funds in common stocks of corporations not affiliated with it, except for some special purpose. Any difference between the cost of these securities and what was received for them on the market was transferred to earned surplus.
14. From October 13,1904, and until its complete liquidation in 1947, Electrical Securities Corporation was a New York corporation. At all times material here, all of its outstanding common stock was owned by plaintiff. It was originally organized and operated for the purpose of ex *636 tending credit to tbe public utility industry. After December of 1928, aside from tbe administration of investments previously made, tbe primary purpose of Electrical Securities Corporation was to act as a medium of investment of tbe funds of tbe General Electric Pension Trust. This pension trust had been established by plaintiff in 1927 to bold funds contributed by plaintiff for tbe payment of pensions to eligible employees on retirement. In September of 1946, plaintiff modified its pension plan so that thereafter contributions were made both by plaintiff and by participating employees. The trust agreement provided that no employee money could be invested in securities of corporations affiliated with plaintiff. Accordingly, Electrical Securities Corporation could no longer serve as a medium of investment of tbe funds in the pension trust and it was liquidated in 1947. As of tbe time of its liquidation in 1947, Electrical Securities Corporation held no shares of plaintiff’s common stock.
15. At all times material here, plaintiff owned directly or indirectly tbe controlling interest in certain affiliated corporations through which it conducted a substantial portion of its business. During the years 1951 and 1952, twelve of these affiliated corporations were merged with, or liquidated into, plaintiff.
16. Plaintiff has been active in establishing benefit plans for its employees for many years. Its original pension plan was started in 1912. In addition to the various employee pians considered in these findings, plaintiff has established a life insurance plan, a hospitalization insurance plan, a product purchase plan, and a pension hospitalization plan. None of these involved the use of plaintiff’s own or treasury stock.
17. For many years before the period here involved, plaintiff and certain of its affiliated corporations had paid “extra compensation” to employees in important and supervisory positions, including executive officers, under a plan called “Extra Compensation Plan.” On April 17,1934, plaintiff’s stockholders had authorized the continuation of the plan and empowered the directors “to set aside and disburse in any year out of the earnings of a department or the Company as *637 a whole, as the Plan may be applicable, after deduction of eight per cent' (8%) on the average investment in the department or of the Company as a whole, after providing for all charges and reserves, an amount not in excess of eight per cent (8%) of the balance of such earnings.” The plan was administered by a committee of the board of directors. Under the rules adopted by the committee, it was provided in part as follows:
10. Payments, at the option of the Committee, will be made in cash or securities, or both, as soon as possible after April 1st of the succeeding calendar year. If common stock of the General Electric Company is so distributed, the price of such stock shall be the closing price on the New York Stock Exchange on a date to be decided upon by the Committee.
18. Under date of March 17, 1948, plaintiff sent to its stockholders notice of the annual meeting of stockholders to be held on April 20, 1948. Among other things, the notice proposed an amendment to plaintiff’s Extra Compensation Plan. In the proxy statement accompanying the notice of the annual meeting, the following comment on the Extra Compensation Plan was made:
The Board of Directors of your Company has been deeply concerned for some time with the problem of attracting to and retaining in the service of the Company an able group of executives and of obtaining from this group continuous optimum results from the standpoints of co-operation, interest, ingenuity and efficiency of operation. _ The problem assumes particularly important proportions at this time because with the impending completion of the Company’s post-war expansion and decentralization programs, it is essential that the Company’s top management group be comprised of an able, smooth working and efficient team if maximum profit results are to accrue from these two major programs.
The result sought has been the objective of the Company’s long-standing Extra Compensation Plan under which the principal contributors to the success of the Company are made participants in that success. * * *
The proposed amendment to the plan was approved by the stockholders at the annual meeting on April 20,1948.
*638 19. The material features of the Extra Compensation Plan as so amended may be summarized as follows:
(a) The board of directors was authorized to set aside and disburse in any year out of the earnings of a department or the plaintiff as a whole, after deducting 8 percent on the average investment, an amount not in excess of 8 percent of the balance of such earnings.
(b) The directors had the right to modify or terminate the plan at any time but no change could be made which would increase the amount appropriated without prior approval of the stockholders.
(c) The plan was to be administered by a committee of the board of directors, appointed by the board from their own number and known as the Salary and Extra Compensation Committee.
(dj The amount to be distributed under the plan was to be published each year in plaintiff’s annual report.
20. The Extra Compensation Plan, as amended in 1948, had two parts. In carrying out the first part of the plan, the Salary and Extra Compensation Committee, as soon as practicable after the first of each year, selected participants from employees in important positions who had shown unusual capacity and value. Distributions to these participants were made as soon as possible after April 1 of each year, but for the previous year. With respect to the great majority of the participants, the Committee had the following discretion:
(2) Allotments under the Plan to all other participants shall be paid in full as soon as is practicable. Such payments may, in the absolute discretion of the Committee, be made wholly or partly in cash, in General Electric Company common stock, or in other securities. For the purpose of such distribution, General Electric common stock shall be valued at the closing market price on the New York Stock Exchange on the nearest day of sale preceding the date of allotment, and other securities at their fair market value on the day of allotment and such valuation by the Committee shall be conclusive.
The words “other securities” had been included in the rules for the administration of the plan since 1936, and were designed to maintain flexibility in the administration of the plan in case some future management of the company should *639 ever contemplate using securities other than General Electric common stock as a result of a change in the concept of the plan from that which prevailed throughout the period in question here, when no other securities were used.
21. The second part of the Extra Compensation Plan, as amended in 1948, applied only to relatively few of the participants under the plan, estimated to number from 40 to 60. These were in the top management group. Under this feature of the plan, the Salary and Extra. Compensation Committee had the discretion to divide any allotment to any of these employees into two approximately equal parts. One part was used to determine the nearest number of full shares of plaintiff’s stock which such part would purchase at the closing market price on the New York Stock Exchange on the nearest day of sale preceding the allotment date. This number of shares was then contingently allotted to the participant and was to be paid to him in 10 to 15 annual installments following the year in which the participant’s employment terminated. Each allotment was subject to forfeiture or partial forfeiture by the participant under certain specified conditions. During the period preceding the actual distribution of plaintiff’s shares of stock contingently allotted to the participant, no dividends were paid thereon, but amounts equivalent to the dividends which would have been declared on such shares if they had been outstanding were contingently credited to the participants. These credits, called “dividend equivalents,” were payable at the time each contingent allotment of shares was distributed to the participant and were subject to the same conditions as were applicable to the shares of plaintiff’s stock contingently allotted. The second part of the allotment was to be paid in cash to the participant as soon as was practicable.
22. Effective as of April 17, 1951, the name of the Extra Compensation Plan was changed to Incentive Compensation Plan.[2] As the Incentive Compensation Plan, it re *640 mained in effect through 1953 to the present time and was not further amended until May 21,1954.
23. All distributions under the Extra or Incentive Compensation Plan were made annually on or about April 1. From January 1, 1936, through 1953, the awards (except contingent allotments) made to plaintiff’s employees (including those in affiliated corporations) after withholding of income tax (after the Current Tax Payment Act of 1943 became effective) were paid approximately one-half in cash and one-half in plaintiff’s common stock. If an employee left the payroll of plaintiff before the time of distribution, his award was paid entirely in cash. The Compensation Committee of plaintiff’s board of directors in its discretion determined the award to be paid to each participating employee in a specified dollar amount. The market price of the stock had nothing to do with that determination or with fixing the date of distribution. The market price was taken into consideration only in determining the number of shares to be distributed to each employee in satisfaction of the part of his dollar award that was payable in plaintiff’s common stock.
24. During the years 1937 through 1946, plaintiff made payment of additional compensation to certain of its sales managers and to others of its employees who had performed outstanding services but who in each case did not participate in distributions made pursuant to plaintiff’s Extra Compensation Plan. The manner and amount of such payments were determined by plaintiff’s president in his discretion. Such payments are referred to hereinafter as “Additional Compensation.” After 1946, payments of Additional Compensation made to certain of plaintiff’s sales managers were called “Commissions.” Such payments were made in the years 1947 through 1953 and are referred to hereinafter as “Commissions.” Shares of plaintiff’s common stock were used in the payment of Additional Compensation and Commissions. Distributions as Additional Compensation or Commissions were made at the same time of the year as those made under the Extra or Incentive Compensation Plan.
25. During the years 1936 through 1953, plaintiff made the *641 following distributions of shares of its own common stock under its Extra or Incentive Compensation Plan and as Additional Compensation and Commissions:

Extra/Incentive Additional Year Compensation Compensation Commissions

1936_ 6,419
1937_ 12,757 889
1938_ 31, 853 2,389
1939_ 11,912 27
1940_ 16,846 1,647
1941_ 38,093 1,407
1942_ 57,547 2,987
1943_ 26, 661 129
1944_ 21,935 216
1945_ 18, 600 74
1946_ 18,596 82
1947_ 14,157 598
1948_ 35,249 818
1949_ 49,227 1,082
1950_ 40, 097 618
1951_ 51, 434 942
1952_ 43,428 924
1953_ 42,372 603
The following is representative of the form letter used by plaintiff for the years 1949 through 1953 to notify its participating employees of their awards under the Extra or Incentive Compensation Plan:
Dear Mr.
It is a pleasure to inform you that Extra Compensation has been allotted to you for the year 1950 m the amount of $_which is being paid as indicated below.
May I take this opportunity to thank you for your efforts in our common enterprise.
Payment is made partly in General Electric stock because it seems desirable to encourage leading employees to have a financial stake in the Company to which they are devoting so much of their time and energy. It should be clearly understood, however, that the stock is your property and may be retained or disposed of according to your own judgment.
Cordially yours,
*642 Method of Paying Extra Compensation
Allotment shown above_$
Income tax withheld_
Certificate for shares of General Electric
Common stock at $54.125 per share-
Check_
26. In using its treasury stock for distributions under the Extra or Incentive Compensation Plan, rather than cash or the stock of other corporations, plaintiff had two objectives ancillary to its primary objective of paying additional compensation to its employees: first, to provide an incentive for its key employees to put forth their best efforts in behalf of the company; and, second, to obtain for plaintiff a continuing benefit by giving these key employees a continuing stake in the affairs and future financial success of the company. Acting within the scope of the Compensation Committee’s discretion under the plan to decide what part of the sum payable to the employee would be in cash and what part would be in stock and to decide whether to use plaintiff’s stock or that of some other corporation, plaintiff could have used stock of any other corporation for distributions under the Extra or Incentive Compensation Plan. It never did so and never considered doing so for the reason that by use of stock of another corporation, it would not have accomplished its objective of giving the participants a continuing stake in the affairs and future financial success of plaintiff. In order that the participating employees should have ready marketability for the stock, the ownership of the shares of plaintiff’s stock in the hands of the participating employees was not restricted. Since plaintiff’s stock was widely held, control was not a factor under the plan. Plaintiff’s management today believes that as a result of years of distributions of plaintiff’s stock under the plan, plaintiff has more stockholders among the participating employees than it would have had if the distributions had been all in cash.
27. Effective October 1, 1948, plaintiff, with the approval of its stockholders, established the G. E. Employees Savings and Stock Bonus Plan (hereinafter called the “Stock Bonus Plan”). In recommending the adoption of this plan to *643 plaintiff’s stockholders, the management stated in part as follows:
The management of the Company believes it highly desirable to work out at this time another long range program for employee savings. In view of the success and popularity of such plans in the past and the very great assistance which they have afforded participating employees in time of economic stress, the management believes that the cost of such a plan would be much more than justified by the resulting improvement in employee security and morale. * * *
*í» í|í íj» $
* * * Moreover, the management of the Company believes that it would be very much in the interest of both the employees and the Company to have the benefits of any new plan depend at least in part upon the success of the Company.
28. The Stock Bonus Plan, as finally adopted, in substance provided as follows:
(a) All employees including those of affiliated companies, except directors, senior officers and some major executives, could elect to participate in the plan.
(b) To participate, an employee would authorize regular payroll deductions within certain specified limits for the purchase of U.S. Savings Bonds, Series E, and deposit with the plaintiff the bonds so purchased.
(c) The employee would authorize plaintiff to retain the bonds so purchased in custody for his account for approximately a five-year holding period. The authorization was revocable, and an employee was entitled to withdraw his bonds in the custody of the company at any time.
(d) At the end of such holding period, the bonds were to be delivered to the owner thereof.
(e) Concurrently with the delivery of the bonds to the owner at the end of the holding period, the plaintiff agreed to have delivered to the employee a stock bonus and the income accumulated thereon. The bonus consisted of shares of plaintiff’s common stock equal to 15 percent of the aggregate cost of the savings bonds purchased by the employee for each year and in the custody of plaintiff at the end of the year.
(f) In the event any employee should withdraw his bonds from the custody of plaintiff prior to the expiration of the holding period, he would forfeit his right to *644 the stock bonus but not his right to any income accumulated with respect to the forfeited stock bonus.
29. Under date of April 22, 1949, plaintiff established the G. E. Employees Stock Bonus Trust (hereinafter called the “Stock Bonus Trust”) to implement the Stock Bonus Plan. The Stock Bonus Trust was to receive and hold the shares of plaintiff’s common stock constituting the stock bonus under the Stock Bonus Plan, to collect and invest the dividends received on the stock held in the Stock Bonus Trust, and to deliver the shares of plaintiff’s stock and the income accumulated thereon to the person or persons entitled thereto. The dividends received by the Stock Bonus Trust were usually invested in short-term Government securities. No investments in stocks of other corporations were made. Under date of August 25, 1949, the Internal Revenue Service ruled that “the plan [Stock Bonus Plan] will meet the requirements of section 165(a) of the Internal Revenue Code, as amended, and that the trust [Stock Bonus Trust] established thereunder, will be entitled to exemption under the provisions of that section.” Said ruling further held that—
Contributions made to the trust will be allowable as deductions from gross income in accordance with Section 23 (p) of the Internal Revenue Code, as amended, subject, however, to verification upon examination of your return.
One of plaintiff’s reasons for using its stock under the Stock Bonus Plan and Trust was to meet the qualification requirements of section 165 (a) of the Internal Revenue Code of 1939. During the period involved here, the trustees of the Stock Bonus Trust, who were officers of plaintiff, and who had power under the terms of the trust to vote the shares of plaintiff’s stock held in the trust, did not vote such shares.
30. Plaintiff’s purpose in establishing the Stock Bonus Plan for its employees was to afford them a convenient means of purchasing U.S. Savings Bonds, Series E, to encourage them to retain the bonds, to provide the participating employees a higher rate of return, and to give them a financial interest in plaintiff through ownership of its stock. Con *645 tributions of its stock to the Stock Bonus Trust were made by plaintiff in February of each year. No stock of any other corporation has ever been used, and the Stock Bonus Plan is still in effect.
31. During the years 1949 through 1953, plaintiff made the following transfers of shares of its common stock held in its treasury to the Stock Bonus Trust as contributions under plaintiff’s Stock Bonus Plan:

Year of Transfer Shares Transferred

1949_ 19, 537. 67
1950_ 78, 537. 09
1951_ 46, 944.54
1952_ 39,485.76
1953_ 43,142.35
32. During the years 1949 through 1953, plaintiff sold, at the market price, the following shares of its common stock held in its treasury to certain of its affiliated corporations for use by said corporations as transfers to their employees under the Extra Compensation Plan or Incentive Compensation Plan and as transfers to the Stock Bonus Trust as contributions under plaintiff’s Stock Bonus Plan:

Year of Sale Shares Sold

1949— 9, 864. 33
1950_ 10,256. 91
1951_ 10,901. 46
1952_ 7, 867. 24
1953_ 2,865.65
The types of employees of the affiliated corporations who were eligible to participate in said plans were the same as the types of plaintiff’s employees who were eligible to participate therein. In each instance, plaintiff sold to the affiliated corporation the number of shares which the latter then needed under one of the plans. The affiliated corporations did not ever buy plaintiff’s stock on the open market for use under said plans. Plaintiff’s treasurer’s office was responsible for the acquisition of plaintiff’s stock on the open market for use by both the plaintiff and the affiliated corporations under the plans, both because the staff of that office had the contacts and experience required to perforin that work adequately and efficiently, and because, if the affiliated corporations had purchased shares on the open market them *646 selves in anticipation of their requirements, they might have acquired more shares or fewer shares than were actually needed. All such sales of treasury stock by plaintiff to its affiliated corporations were made at the market prices of plaintiff’s common stock prevailing on the New York Stock Exchange. From 1936 through 1948, plaintiff also sold shares of its own stock to affiliated corporations for use in the payment of Extra Compensation. All such sales of treasury stock were made at the market prices prevailing on the New York Stock Exchange. The affiliated corporations never used the stock of any other corporation for these purposes.
33. As of October 31,1945, pursuant to a plan of reorganization under section 112(g)(1) of the Internal Revenue Code of 1939 with Electric Vacuum Cleaner Company, Inc., a New York corporation, plaintiff acquired all of the assets of the latter corporation in exchange for 65,918 shares of plaintiff’s common stock then held in its treasury. Electric Vacuum Cleaner Company, Inc., was a manufacturer of vacuum cleaners which plaintiff sold and distributed. Plaintiff wished to manufacture the cleaners itself. Accordingly, it entered into negotiations to take over the assets of the vacuum cleaner company. Plaintiff was informed that the stockholders of Electric Vacuum Cleaner Company, Inc., would not consent to the exchange unless the transaction was a tax-free reorganization to them under the provisions of the Internal Revenue Code of 1939.
34. As of November 1,1946, pursuant to an agreement and plan of reorganization dated October 18, 1946, plaintiff acquired 4,000 shares of common stock and 1,567 shares of preferred stock, being all of the outstanding common stock and 96.5 percent of the outstanding preferred stock of The Mahoning Valley Steel Company, an Ohio corporation. The sole consideration transferred by plaintiff to the former owners of The Mahoning Valley Steel Company in exchange therefor was 52,896 shares of plaintiff’s common stock then held in its treasury. Plaintiff’s officials were informed that the stockholders of The Mahoning Valley Steel Company would not consider disposing of their stock except on the basis of a tax-free merger or reorganization.
*647 35. Plaintiff’s Advisory Committee was a standing committee, composed of certain of plaintiff’s top executive officers, which advised the president of plaintiff in regard to major matters of general company policy and operations. In February and March of 1953, the Advisory Committee considered and recommended that effective April 1, 1953, payments to employees of plaintiff, who filed patent applications, be made on the following basis:
(a) To employees in the research laboratory — $25.00 in cash
(b) To all other employees, one share of plaintiff’s stock plus enough cash to offset the withholding tax.
Pursuant to the recommendations of the Advisory Committee, plaintiff in 1953 transferred 508 shares of its common stock held in its treasury to employees of plaintiff who had filed patent applications covering inventions made by them. For some years before 1953, plaintiff had made awards, called the Charles A. Coffin Memorial Awards, to certain of its employees for outstanding accomplishments. Charles A. Coffin was the founder and creator of plaintiff. In 1953, plaintiff made Coffin awards to 40 of its employees consisting of five shares of plaintiff’s common stock held in its treasury to each recipient or a total of 200 shares. Plaintiff’s management considered these transfers of plaintiff’s stock as honorariums, hoping they might give the recipients a feeling of participation in the affairs of the company even though on a very small basis.
36. To publicize the celebration of plaintiff’s seventy-fifth anniversary on October 15, 1953, plaintiff on January 15, 1953, made the following announcement:
BABY DERBY TO HELP MARK G.E.’S 75TH ANNIVERSARY
new york, n.y., Jan. 14 — Seventy-five years ago on October 15, thirteen confident investors organized a company for the purpose of inventing an electric lamp.
This was the Edison Electric Light Company, the first of the firms which, in 1892, became the General Electric Company.
To salute the occasion, General Electric today announced that it is preparing to create another group of share owners on the anniversary date by awarding five *648 shares of company stock to babies bom to G-E employees on October 15.
General Electric now has approximately 210,000 employees. To be eligible for the baby derby, at least one parent must be on the company payroll as of today and the October 15 stock “date of issue.”
With something less than their normal confidence, G-E statisticians estimated that the new group might be composed of the same number of new share owners as the original group.
On October 15,1953,191 children were born to employees of plaintiff and its affiliated corporations. Pursuant to the foregoing announcement, plaintiff issued in trust for each of such children five shares of its common stock held in its treasury. Of these shares, 950 were issued in 1953 and the equivalent of five in 1954 (fifteen after an intervening 3 for 1 stock split in 1954). The baby derby was inaugurated and carried out for its publicity value to plaintiff. No stock of another corporation has ever been used by plaintiff for any similar purpose.
37. On November 24,1953, plaintiff sent a letter to Canadian General Electric Company, Limited, a Canadian corporation, offering to acquire, at $550 per share, the minority outstanding shares of stock of that corporation. The average price of Canadian General Electric stock during 1953 was $438. Plaintiff then owned approximately 96 percent of it. The remaining stock was in the hands of Canadian stockholders and owners resident in Great Britain, on the Continent and in the United States. Stockholders in Canada, Great Britain and on the Continent were given the choice of receiving payment either in cash or in plaintiff’s common stock. This offer to pay in plaintiff’s stock was made with the hope that the alternative of participation in the over-all enterprise would operate as an inducement to the minority stockholders to accept the offer. No such right of receiving plaintiff’s stock was extended to minority stockholders in the United States because that would have necessitated the expense of registering plaintiff’s stock under the Securities and Exchange Act of 1934. During the remainder of 1953, pursuant to the foregoing offer, plaintiff transferred to former owners of stock of Canadian General Elec- *649 trie Company, Limited, 7,747 shares of plaintiff’s common stock then held in its treasury.
38. Plaintiff’s annual meeting of its stockholders for 1953 was held on April 21,1953. At that meeting, Dr. Benjamin P. Whitaker acted as Chairman of the Inspectors of Election. In May of 1953, plaintiff issued to Dr. Whitaker two shares of its common stock held in its treasury in connection with his services as Chairman of the Inspectors of Election.
39. During the years 1949 through 1953, plaintiff made no further dispositions or sales of its common stock held in its treasury except as follows:

No. of Year Transferee Shares Purpose

1950 Harvard University- 6,700 Charitable Contribution
1952 General Electric Educational 100 Do. and Charitable Fund.
American Institute of Eleetri- 150 Do. cal Engineers.
1953 St. Vincent’s Hospital Associa- 2, 150 Do. tion, Erie, Pa.
General Electric Educational 44, 900 Do. and Charitable Fund.
40. The record contains no evidence that plaintiff has ever sold shares of its treasury stock on the open market.
41. As of January 1, 1936, plaintiff held 7.56 shares of its own common stock in its treasury. The following schedule sets forth the acquisitions by plaintiff of its common stock from January 1,1936, to January 1,1949:

Year No. of Shares Acquired Source

1936 2. 48 Purchased on open market
8, 111 Purchased from Electrical Securities Corporation
96, 000 Dividend from Electrical Securities Corporation
1. 24 Purchased on open market O CO -a
18, 939 Purchased from Electrical Securities Corporation © CO oo
6,134 Do. cO 03 co
. 24 Purchased on open market zO o
2, 331 Purchased from Electrical Securities Corporation

*650
Source No. of Shares Year Acquired

Purchased on open market 1941 25, 000. 52
Purchased from Electrical Securities Corporation 61, 400
Purchased on open market 1942 42,400
Do. 1943 35,200.32
Do. 1944 47,400
Purchase on open market 1945 36,600
Dividend from Electrical Securities Corporation 12, 300
Dividend from G.E. Employees Securities Corporation 6, 800
Purchased on open market 1946 65, 500
Dividend from Electrical Securities Corporation 8, 350
Purchased on open market 1947 20
Dividend from G.E. Employees Securities Corporation 36, 400
Purchased on open market 1948 16,700
Dividend from G.E. Employees Securities Corporation 10, 000
Distribution upon liquidation of G.E. Employees Securities Corporation 475, 800
The stock so acquired was not retired but was held by plaintiff as treasury stock. «
42. During tbe period from January 1,1936, to December 31,1953, plaintiff maintained a record by certificate numbers of its acquisitions and dispositions of its common stock. As of January 1, 1949, plaintiff field in its treasury 497,778.36 shares of its common stock. These specific shares had been acquired in the following maimer:

Shares

Purchased on the open market_ 9, 700. 36
Dividends received in 1947 and 1948 from G.E. Employees Securities Corporation_ 12, 278. 00
Distribution in 1948 upon liquidation of G.E. Employees Securities Corporation_ 475, 800. 00
Total__497,778.36
The 9,700.36 shares held by plaintiff as of January 1,1949, which had been purchased on the open market, had been acquired pursuant to authorizations by plaintiff’s board of directors for use in payment of Extra Compensation and for other corporate purposes.
*651 43. The following schedule sets forth the acquisitions by plaintiff of its common stock from January 1, 1949, to December 31,1953:

Year No. of

Acquires, Source Shares

1949 _ 0
1950Purchased on open market- . 56
Purchased from G.E. Employees Stock Bonus Trust pursuant to Article IV, 3(b)- 117
Total_ 117.56
1951Purchased on open market- 42, 746. 72
Purchased from G.E. Employees Stock Bonus Trust pursuant to Article IV, 3(b)_ 129
Distribution upon merger or liquidation of:
Carboloy Company, Inc- 316
General Electric X-Ray Corporation_ 85
Locke Incorporated_ 467
Monowatt Incorporated- 201
Telechron Inc- 880
The Trumbull Electric Manufacturing Company- 435
Total_ 45, 259. 72
1952 Purchased on open market_ 143, 700
Purchased from G.E. Employees Stock Bonus Trust pursuant to Article IV,
3(b)_ 138
Distribution upon merger or liquidation of:
Hotpoint, Inc_ 2, 186
International General Electric Company, Inc_ 1, 555
Total_ 147, 579
1953Purchased on open market_ 146, 500
Purchased from G.E. Employees Stock Bonus Trust pursuant to Article IV,
3(b)_ 161
Total___ 146, 661
The stock so acquired was not retired but was held by plaintiff as treasury stock.
*652 44. All of the open market purchases in 1951, 1952, and 1953 were made pursuant to authorizations by plaintiff’s board of directors for use in payment of Extra or Incentive Compensation, distributions under the Stock Bonus Plan, or other corporate purposes.
In the opinion of the officials of the plaintiff responsible for seeing to it that an adequate supply of stock was on hand to meet those purposes, the shares on hand in 1949 and 1950, as a result of the liquidation of G. E. Employees Securities Corporation in 1948, were sufficient for those purposes. Accordingly, no open market purchases were made in 1949 and 1950 (except for a fractional share redeemed). During 1951, these officials reached the conclusion that by 1952 plaintiff might not have on hand a sufficient number of shares of its own stock to take care of distributions under the Incentive Compensation and Stock Bonus Plans to be made in the spring of 1952. About midyear in 1951, plaintiff’s Office of Banking and Corporate Finance Service recommended that 100,000 additional shares be purchased in 1951, and, after authorization by the board of directors to purchase up to 100,000 shares, plaintiff began to purchase shares on the New York Stock Exchange through regular brokers. The purchases in 1951,1952, and 1953 were made for corporate purposes and were made in fixed amounts over extended periods of time so as to minimize any effect they might have on the market. The brokers used to acquire these shares were instructed to buy a fixed amount of shares each trading day. The price or prices at which the brokers bought were left to their discretion. Plaintiff expected the brokers to average the market prices in these purchases. The open market purchases during these years were geared to plaintiff’s estimated needs for its stock. It has been plaintiff’s practice not to make private purchases of large blocks of its own stock. It has been plaintiff’s policy not to use newly issued stock except in very exceptional cases. None was used during the years 1936 through 1953.
45. The purchases by plaintiff in 1950,1951,1952, and 1953 of small amounts of its own stock from the Stock Bonus Trust were pursuant to authority granted in the trust to the trustees to sell such of plaintiff’s stock as might be necessary *653 to provide funds for payment for fractional interests in plaintiff’s stock. The shares of its own stock acquired by plaintiff in 1951 and 1952, upon the merger or liquidation of certain of its affiliated corporations, represented shares held by such corporations on account of contingent allotments previously made to their employees under the deferred feature of the Extra or Incentive Compensation Plan.
46. At the end of 1953, plaintiff held 273,000 shares of its own stock in its treasury. Of these, 78,000 shares had already been set aside under the deferred feature of the Extra or Incentive Compensation Plan and hence were not available for use again. Plaintiff considered the balance of 195,000 shares adequate in view of its requirements for 1953 and its estimated requirements for 1954.
47. At all times between January 1,1936, and December 31, 1953, plaintiff recorded acquisitions of treasury stock on its books of account by a charge to an asset account entitled “G.E. common stock reacquired.” This was a separate account on plaintiff’s ledgers, the use of which was confined solely to recording the acquisitions of plaintiff’s common stock. In the balance sheets included in plaintiff’s reports to its stockholders and in those attached to plaintiff’s income tax returns, such stock was likewise carried as an asset, separately reported under the heading of investments. It was the practice of plaintiff during the years here involved to make an explanatory note as to the purposes for which its stock was held. The note accompanying the balance sheet in plaintiff’s report to its stockholders for 1952 is typical and reads as follows:
Note 9. General Electric common stock in the portfolio was held for corporate purposes and was carried at its cost. There were 159,335 shares held on December 31, 1952, the aggregate quoted market value of which was $11,591,595.
Plaintiff’s officials responsible for this accounting procedure believed that, since plaintiff had acquired shares of its own stock with no intention of retiring them, but for specific coi’porate purposes, it was more informative to its stockholders to carry the stock on the asset side of its balance sheets. They also believed that whether plaintiff’s treasury stock *654 was carried on the asset or liability side of its balance sheets was of relatively little significance. Plaintiff’s public accountants never differed with plaintiff’s practice. This stock could have been placed on the liability side of the balance sheet and shown as a reduction of capital. If that had been done, an explanatory note would have been necessary, indicating that plaintiff intended to use the stock for corporate purposes.
48. Upon the disposition of treasury stock, any difference between its fair market value and its cost was recorded by plaintiff on its books of account in its capital surplus account and no income therefrom was reported in its financial statements. The ultimate result would have been the same had plaintiff carried its treasury stock on the liability side of its balance sheets, according to an alternative accounting practice preferred by some authorities. In either case, any difference between what was paid for the stock and the value received upon its disposition would be reflected in capital surplus and would not appear as income. With respect to the dispositions of treasury stock under the Extra or Incentive Compensation Plan, to the Stock Bonus Trust, as patent awards in 1958, as Coffin awards in 1953, under the baby derby in 1953, to the Inspectors of Election in 1953, and as charitable contributions, the net result of the entries recorded on plaintiff’s books of account was a charge to expense accounts for the fair market value of the stock, a credit to the G. E. common stock reacquired account for the cost of the stock, and a charge or credit to the capital surplus account for any difference between the fair market value of the stock and its cost.
49. With respect to the treasury stock sold by plaintiff during the years 1949 through 1953 to certain of its affiliated corporations for use under the Extra or Incentive Compensation Plan and as transfers to the Stock Bonus Trust, the net result of the entries recorded on plaintiff’s books of account was a charge to receivable accounts for the fair market value of the stock sold, a credit to the G. E. common stock reacquired account for the cost of the stock, and a charge or credit to the capital surplus account for any difference between the fair market value of the stock and its cost. *655 With respect to the disposition in 1953 of plaintiff’s treasury stock in the acquisition of minority shares of stock of Canadian General Electric Company, Limited, the net result of the entries recorded on plaintiff’s books of account was a charge to investment in affiliated companies account for the fair market value of the stock, a credit to the G.E. common stock reacquired account for the cost of the stock, and a credit to the capital surplus account for the difference between the fair market value of the stock and its cost. None of plaintiff’s common stock held by it in its treasury carried voting rights and no dividends were paid thereon.
50. The high and low market prices of plaintiff’s common stock as traded on the New York Stock Exchange for the years 1936 to 1953 are as follows:

Year High how

1936_ $55 $34 50
1937_ 64.875 34
1938_ 48 27.25
1939_ 44.625 31
1940_ 41 26.125
1941_ 35.125 24. 75
1942_ 30. 75 21. 5
1943_ 39.875 30. 75
1944_ 40.375 35
1945__ 49. 625 37.875
1946_ 52 33.5
1947_ 39.875 32
1948_ 43 31.75
1949_ 42.375 34
1950_ 50. 5 41.125
1951_ 63.875 49.5
1952_ 72.75 54.375
1953___ 92.25 66.25
51. For each of the years 1936 through 1952 on its Federal income tax returns, plaintiff reported as capital gains or losses the differences between the tax cost basis of the shares of its common stock held in its treasury and disposed of in such year and the market value-thereof. On its 1953 return, plaintiff did not report any capital gains or losses based on such differences in respect of treasury stock disposed of in that year because plaintiff’s officials responsible for the accounting treatment of such differences for tax purposes had reached the conclusion that such differences did not consti *656 tute capital gains or losses. Such, differences were, however, treated as capital gains and losses by the District Director upon examination of plaintiff’s 1953 return, and resulted in assessment and payment of additional tax.
No capital gain or loss was reported with respect to the shares disposed of in 1950, 1952, and 1953 as charitable contributions.
52. For the years 1949 through 1953 on its Federal income tax returns or, in the case of its 1953 return, as the result of examination thereof, plaintiff reported and paid a tax thereon on the following net capital gains with respect to the shares of its common stock held in its treasury and disposed of as set forth in these findings, with the exception of the charitable contributions in 1950,1952, and 1953:

Year No. of Shares Net Capital Gain

1949_ 79, 711. 00 $1,109, 628.31
1950_ 129,509.00 3,777,069.17
1951_ 110,222. 00 4, 960, 782. 61
1952_ 91, 705. 00 873, 295. 94
1953_ 98,390. 00 544,232. 81
Three factors in combination contributed materially to the size of these gains: (1) the large block of plaintiff’s common stock it received in 1948 upon liquidation of G. E. Employees Securities Corporation was held by plaintiff at its relatively low cost to G. E. Employees Securities Corporation, because of the tax-free character of that liquidation; (2) it took plaintiff a long time to use up those shares under the various employee plans; and (3) during the period here involved (1949-1953) the market price of plaintiff’s stock was in general advancing.
On the basis of the whole record, it is evident that the timing of plaintiff’s acquisitions and dispositions of its own stock, in carrying out the various employee plans and other corporate operations described in these findings, was related to fulfillment of the requirements and objectives of such plans and other corporate operations.
53. The following table sets forth for the years 1949 through 1953 the average number of plaintiff’s employees, the number thereof who participated in plaintiff’s Extra or Incentive Compensation Plan and the number who participated in plaintiff’s Stock Bonus Plan:
*657 1949
Number of employees-161,733
Number of participants (E.C./I.C. Plan)- 2,267
Number of participants (Stock Bonus Plan)- 61,357
1950
Number of employees_ 165, 345
Number of participants (E.C./I.C. Plan)_ 2,364
Number of participants (Stock Bonus Plan)- 61,122
1951
Number of employees- 201, 543
Number of participants (E.C./I.C. Plan)- 2,357
Number of participants (Stock Bonus Plan)_ 78,718
1952
Number of employees_215, 392
Number of participants (E.C./I.C. Plan)_ 2,417
Number of participants (Stock Bonus Plan)_ 73,991
1953
Number of employees- 231,334
Number of participants (E.C./I.C. Plan)- 2, 222
Number of participants (Stock Bonus Plan)- 90,669
54. With, respect to the dispositions made by plaintiff during the years 1949-1953 of its common stock held in its treasury under the Extra or Incentive Compensation Plan and to the Stock Bonus Trust, and in 1953 as patent and Coffin awards, under the baby derby, and to the Chairman of the Inspectors of Election, and in 1950, 1952, and 1953 as charitable contributions, plaintiff on its tax returns claimed and was allowed deductions from gross income under section 23 of the Internal Bevenue Code of 1939, as amended, computed upon the fair market value of the stock disposed of. With respect to the dispositions under the Extra or Incentive Compensation Plan and to the Stock Bonus Trust, each deduction was claimed and allowed on the accrual basis for the taxable year preceding the year in which the corresponding disposition occurred, except that plaintiff claimed and was allowed a deduction for the taxable year 1949 on account of the 19,537.67 shares it transferred in that year to the Stock Bonus Trust.
55. With respect to the sales made by plaintiff of its common stock held in its treasury to certain of its affiliated corporations for use by such corporations under the Extra or *658 Incentive Compensation Plan and as transfers to tire Stock Bonus Trust, and with respect to the exchange of such stock for certain minority shares of stock of Canadian General Electric Company, Limited, plaintiff on its tax returns claimed and was allowed no deductions therefor.
56. Within the times prescribed by law, plaintiff filed with the District Director its claims for refund covering the issues raised in its petition. On January 12,1959, the claims for the years 1949, 1950, and 1951 were disallowed by the Commissioner in accordance with the provisions of section 3772(a) (2) of the Internal Revenue Code of 1939, as amended. On March 6, 1959, the claims for 1952 and 1953 were likewise disallowed by the Commissioner.
57. Plaintiff is the owner of the claims herein asserted and no assignment or transfer of the same or any part thereof has heretofore been made.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and, therefore, its petition is dismissed.

 Plaintiff disposed of these shares at their market value on the dates of disposition, which was between $15,000,000 and $20,000,000.

 In an effort to minimize confusión that might occur as a result of this change in the name of the plan, the plan will be referred to as the “Extra or Incentive Compensation Plan” in subsequent findings, where the period of time involved covers both the Extra Compensation Plan and the Incentive Compensation Plan. Otherwise the name currently in effect, as of the time referred to, will be used.